Abilio ALVAREZ, Plaintiff,

v.

KEY TRANSPORTATION SERVICE CORP., A Florida Corporation, and Orlie Jedwab, individually, Defendants.

No. 07–22591–CIV.

United States District Court, S.D. Florida.

March 3, 2008.

Chad Evan Levy of Levy & Levy, P.A., Fort Lauderdale, FL, for plaintiff.

Patrick G. DeBlasio III of Littler Mendelsohn, Miami, FL, for defendant.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PAUL C. HUCK, District Judge.

This cause is before the Court on Defendants' Motion for Summary Judgment, filed January 22, 2008 [D.E. # 17]. Plaintiff filed a Response to Defendants' Motion for Summary Judgment on February 7, 2008 [D.E. # 29], and Defendants filed a Reply on February 19, 2008 [D.E. # 33]. Plaintiff originally filed his Complaint on October 2, 2007 [D.E. # 1]. He filed a Statement of Claim on October 23, 2007 [D.E. # 5], and an Amended Statement of Claim on November 28, 2007 [D.E. # 11]. Defendants' filed their Answer to Plaintiff's Complaint on November 15, 2007 [D.E. # 9].

## I. BACKGROUND

This is a case about a car dispatcher who claims he is owed overtime backpay by the transportation service that employed him for almost three years. Plaintiff Abilio Alvarez began work as a dispatcher for Defendants in 2004. Defendant Key Transportation Service Corporation ("Key") is a chauffeured ground transportation services company for the south Florida area, and is owned by Defendant Orlie Jedwab. As a dispatcher, Alvarez was responsible for coordinating and directing Key's drivers to transport customers to various locations throughout south Florida.

When he began his job at Key on December 6, 2004,[1] Alvarez earned $10.00 per hour, and he was given a raise to $11.50 per hour on July 25, 2005.[2] As an hourly employee, Alvarez was required to keep track of the time he worked, although the parties disagree about what method Alvarez and other employees used to keep track of their time.[3] Alvarez began working at a rental car company on August 22, 2005, in addition to his job at Key. He worked at the rental car company until October 2, 2006, and worked only on a part-time basis during that entire period for Key (i.e. under 40 hours per week).

Back at Key full-time on October 2, 2006, Alvarez began his tenure as the Night Dispatch Manager. Working on a salary of $650 per week but ineligible for overtime hours in this position, Alvarez worked at night with three or four other dispatchers. Alvarez's duties as Night Dispatch Manager included the following:

- dispatching drivers to their assigned jobs and ensuring they arrived on time;

1. The Court will use the dates provided in the nonmovant's (i.e. Plaintiff's) Statement of Undisputed Facts for background purposes. The Court, however, is not ruling on which party's dates are accurate.

2. Dispatcher pay ranged from $10.00 per hour to $14.50 per hour at Key for the relevant time periods.

3. The parties argue at length in their briefs about the methods of timekeeping used at Key. Defendants claim their employees, including Alvarez, were explicitly instructed to keep track of all hours on a time card using a mechanical punch-in and punch-out system to accurately monitor each employee's hours. Alvarez, on the other hand, states that Key instructed him and other employees to hand write their hours on a time card (for all hours up to 40 hours) and to hand write all overtime hours on a sticky pad. This system, Alvarez asserts, was used to disguise the actual number of overtime hours worked so Key could pay employees any overtime hours in cash at straight time instead of overtime pay.

- monitoring traffic, weather, and airport flight arrival delays;

- interacting with clients, airport representatives, and drivers;

- updating trip logs for recordkeeping;

- reporting vehicle breakdowns to upper management; and

- alleviating driver or customer problems.

Alvarez also locked up the premises at night, closing all windows and doors and placing bars on the windows, and took care of Key's security dogs. He would also clean desks, clean and repair computers, repair desks, and wash cars. He occasionally circulated memoranda on topics like complimentary drinks and taking days off.

As Night Dispatch Manager, Alvarez had the authority to discipline employees, according to Key and Jedwab, but Alvarez disputes that assertion, and there is no evidence in the record that Alvarez ever actually disciplined any employees.[4] In addition to having the authority to disci-

pline employees, Defendants claim that Alvarez had the authority to fire employees. Alvarez both disputes that he had such authority and contends that he never fired any employee—a contention Defendants do not dispute. Alvarez and the other night dispatchers were not supervised during the night shift. No Night Dispatch Manager existed before or after Alvarez was named to that position.

After working as the Night Dispatch Manager for a little more than six months, Alvarez met with Jedwab to complain that he was working too many hours without enough pay. A short time later, on May 7, 2007,[5] he was switched back to an hourly employee earning $16.25 per hour.[6] Alvarez worked as an hourly employee at that wage until August 27, 2007, when he was fired by Defendants.

Alvarez claims he is entitled to relief under § 207(a)(1) of the Fair Labor Standards Act ("FLSA") against Defendants Key and Jedwab for $12,626.69 in overtime backpay.[7] Defendants move for summary judgment on the following three grounds:

4. Alvarez testified that he considered "disciplin[ing] the drivers" his most significant achievement at Key, Alvarez Dep., 13:7–10, but there is no evidence explaining what that entailed or how often he did so.

5. Again, May 7, 2007 is when Alvarez claims he was switched from salary to hourly pay. Defendants claim they switched him on April 24, 2007. For the purposes of deciding this Motion for Summary Judgment, the Court will use the dates provided by the nonmovant.

6. Key arrived at $16.25 per hour by dividing Alvarez's $650–per–week salary by 40 hours. After the switch back to hourly pay, Alvarez could again earn overtime pay.

7. Alvarez claims he is owed the overtime compensation for approximately November 15, 2004 through July 25, 2006 (at $10.00 per hour), and overtime compensation for July

26, 2006 through October 9, 2006 (at $11.50 per hour). This ignores that Alvarez has admitted that he did not work any overtime from August 22, 2005 through October 2, 2006 when he was working only part-time. (The dates on this point in Alvarez's Statement of Claim and Summary Judgment briefing are at odds.) Thus, the appropriate calculation for Alvarez's claim should be overtime compensation for approximately November 15, 2004 through July 25, 2005 (at $10.00 per hour), and overtime compensation for July 26, 2005 through August 22, 2005 (at $11.50 per hour)—less the straight time he was already paid for those overtime hours. He then claims he is owed overtime compensation for any overtime hours worked from approximately October 2, 2006 until May 7, 2007, the dates he was paid a salary as the Night Dispatch Manager, and for any overtime hours worked from approximately May 8, 2007 until August 27, 2007, the date he was fired.

(1) Key already paid Alvarez all overtime wages owed to him by virtue of his employment with Key; (2) Alvarez was an "administrative" employee, as defined by the FLSA, and thus was exempt from earning overtime wages; and (3) Alvarez was an "executive" employee, as defined by the FLSA, also exempting him from earning overtime wages. The Court will address each ground for Defendants' Motion for Summary Judgment in turn.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen*, 121 F.3d at 646. "In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir.1995) (citations omitted). "The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one." *Id.* (quoting *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988)). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252–53, 106 S.Ct. 2505.

Further, while the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the nonmoving party, or evidence that is merely colorable or not significantly probative, is not enough. *Id.; see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996) (holding that conclusory allegations and conjecture cannot be the basis for denying summary judgment).

### B.  Analysis

The FLSA was designed to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202 (2007). According to the FLSA, an employee covered under the Act must receive overtime pay "at a rate not less than one and one-half times the regular rate at which he is employed" if he works a work week longer than forty hours. *Id.* § 207(a)(1). But the overtime wage requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1).

"Congress expressly authorized the Secretary of Labor to define the scope of the executive, administrative, and professional employee exemptions [in section 213(a)(1) ]." *Avery v. City of Talladega,* 24 F.3d 1337, 1340 (11th Cir.1994) (citation omitted). To determine whether a genuine issue exists about whether Plaintiff qualified as an "administrative" or "executive" employee within the meaning of section 213(a)(1), the Court looks to applicable case law and to the Code of Federal Regulations. ' "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.' " *Id.* (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

### 1. Alvarez's Overtime Wages as a Dispatcher

■ Defendants claim that they paid Alvarez all overtime wages earned from approximately November 15, 2004 through August 22, 2005, and from approximately May 7, 2007 through August 27, 2007 (i.e. the dates Alvarez was employed by Key when he was neither working part-time nor as the Night Dispatch Manager). They acknowledge that they did not pay him overtime wages while he was the Night Dispatch Manager because, they claim, Alvarez was exempt from overtime pay during that time as an "administrative" or "executive" employee. Meanwhile, Alvarez contends that Key failed to pay him overtime wages earned for those dates.

This disagreement is clearly a factual dispute involving the weight of evidence and credibility of witnesses that the Court cannot resolve on summary judgment. While Defendants claim that they paid Al-

varez for his overtime hours during those periods, Alvarez testified that they did not. Both sides point to evidence supporting their contentions about payments made and how Alvarez recorded his work time. There are thus many genuine issues of material fact to be decided at trial, and Defendants' Motion for Summary Judgment on this ground must therefore be denied.

### 2. The "Administrative" Exception to the FLSA's Overtime Wages Requirement

Because Defendants are not entitled to summary judgment on whether Alvarez was paid all overtime wages for the dates discussed above, the only issue remaining for the Court to decide is whether Alvarez is owed overtime wages for his work as Night Dispatch Manager.

First, Defendants argue that Alvarez was an "administrative" employee, as defined by 29 C.F.R. § 541.200, while he was the Night Dispatch Manager, and thus is exempt from FLSA's overtime wages requirement. An employee is considered an "administrative" employee if he meets the following three requirements: (1) the employee is compensated on a salary or fee basis of at least $455 per week; (2) whose primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) whose primary duty includes the "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

The phrase "directly related to the management and business operations" requires the employee to "perform work directly

related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a). The regulations explain that work directly related to management or general business operations includes work in the following "functional areas": tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. *Id.* § 541.201(b). The Code of Federal Regulations further points to the following factors to consider when assessing whether an "employee exercised discretion and independent judgment with respect to matters of significance":

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management;

whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.*

■ Here, Alvarez's duties were not directed toward management or the general business operations of Key, nor did Alvarez exercise discretion and independent judgment on important matters. First, Defendants' attempt to characterize Alvarez as an "administrative" employee would render the phrase "directly related to the general business operations of an employer" so broad that almost any job could be shoehorned into it. Looking at some of the illustrative categories under § 541.201(b)—tax, finance, marketing, personnel management, and legal compliance, for example—the Court does not see how a dispatcher could reasonable fall within any of the listed categories. As the Night Dispatch Manager, Alvarez performed duties closer to "working on a manufacturing production line," or "selling a product in a . . . service establishment" because he was working toward fulfilling a customer's need for a service, than to performing administrative duties, which generally do not involve customers but rather the day-to-day operations of the business.

Second, Alvarez did not "exercise[ ] discretion and independent judgment with respect to matters of significance." *See id.* While he may have exercised discretion and independent judgment on relatively trivial matters of directing cars to pick up passengers, his decisions were far from "matters of significance" for Key. Generally, "matters of significance" include re-

sponsibilities dealing with matters of broad scope and significant detail that have a profound effect on an employer's business. *See id.* (describing "matters of significance" as, for example, committing an employer in "matters that have significant financial impact"; negotiating and binding the company on significant matters; and planning long- or short-term business objectives). Considering his duties principally involved monitoring traffic, directing cars to pick up customers, and providing customer service, this Court finds that Defendants have not carried their burden of showing that Alvarez fell within what the regulations require for an employee to qualify as an "administrative" employee in his role as Night Dispatch Manager.[8] Defendants thus have failed to demonstrate that they are entitled to a judgment as a matter of law that Alvarez was a bona fide "administrative" employee, and thus they have not shown that Alvarez was exempt from the FLSA's overtime wage requirement as the Night Dispatch Manager.

### 3. The "Executive" Exception to the FLSA's Overtime Wages Requirement

Defendants also argue that they are entitled to summary judgment because Alvarez qualifies as an "executive" employee under the FLSA and is thus exempt from the FLSA's overtime wage requirements. As mentioned above, the FLSA overtime wage exemptions include "any employee employed in a bona fide executive, admin-

istrative, or professional capacity." 29 U.S.C. § 213(a)(1).

According to the Code of Federal Regulations, the term "employee employed in a bona fide executive capacity" means any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;

(2) Whose *primary duty is management* of the enterprise in which the employee is employed . . . ;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100 (emphasis added). Generally, "management" includes

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among

---

**8.** Defendants imply, but never explicitly argue, that *all* dispatchers are "administrative" employees. Defendants point to various duties Alvarez carried out to demonstrate that he was an "administrative" employee, but these were largely the same duties that *any* of Key's dispatchers, who were all nonexempt, hourly employees, would carry out. Because

Defendants do not explicitly argue that all Key dispatchers are "administrative" employees, however, this Court need not decide that question. But this Court notes, based on the applicable regulations, it is unlikely that any Key dispatcher would qualify as an "administrative" employee under § 541.200.

the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

The Code of Federal Regulations instruct courts to analyze the following factors in assessing whether an employee's "primary duty" is management: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* § 541.700(a). The regulations further explain that the touchstone to determine whether exempt work is the primary duty of an employee occurs when the employee spends more than 50 percent of his time performing exempt work. *Id.* § 541.700(b). But "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.; see Debrecht v. Osceola County,* 243 F.Supp.2d 1364, 1373 (M.D.Fla.2003) (holding that battalion chiefs for emergency services department were "managers" despite spend-

ing less than 50 percent of their time actually engaging in management because their nonexempt time "assumes the character of the work [they] perform once dispatched to an emergency scene," where they were managers).

■ The Court will assess whether Alvarez was a bona fide "executive" employee by analyzing the second requirement under § 541.100 [9]—i.e. whether Alvarez's "primary duty" was "management" of the "enterprise in which the employee is employed." The Court finds that it was not.

First, Defendants have not carried their burden of demonstrating that Alvarez was an "executive" employee under § 541.100 because most of his duties fall outside the description of "management." *See id.* § 541.102. Among the factors listed under § 541.102 to determine whether an employee was involved in management, Alvarez carried out few, if any, of the listed tasks. For example, he did not interview potential dispatchers nor did he select dispatchers; he did not set rates of pay; he did not appraise other dispatchers' productivity for promotions; he did not determine techniques to be used in dispatching cars; he did not plan or control any budgets; nor did he monitor any parts of the company for legal compliance measures. In fact, Defendants point to just a few responsibilities Alvarez arguably possessed that might give rise to the inference that his primary duty was management. Defendants principally rely on Alvarez's authority to handle complaints, discipline employees, and fire employees to support their assertion that he was involved in

---

**9.** Because the Court disposes of whether Alvarez qualifies as an exempt "executive" employee under the second prong of the test, it need not decide whether he satisfies requirements (1), (3), and (4) under § 541.100.

management.[10] Importantly, Alvarez disputes that he had the authority to fire employees. Even assuming that he did have such authority, however, Defendants point to no evidence that suggests Alvarez ever used this authority.

Moreover, Defendants' assertion that Alvarez was acting as a manager over the drivers he was dispatching instead of over other dispatchers, *see* Def.'s Mot. For Summ. J, at 11, implies that all dispatchers are managers. In fact, most of what Defendants claim were "management" duties were indistinguishable from Alvarez's duties as a dispatcher. One passage from Alvarez's deposition encapsulates the idea that Defendants conflate Alvarez's dispatcher duties with his supposed "management" duties:

Q: You were responsible also for monitoring traffic, weather and airport flight arrival and delays, correct?

A: Well, all do that, yes.

Q: You were to ensure and provide excellent interaction with clients, correct?

A: Yes.

Q: As well as with the airport representatives and the chauffeurs, correct?

A: That's what we all do, yes.

Q: You were responsible for updating the trip log with any irregularities for recordkeeping purposes, correct?

A: Again, we all do that.

Q: You were responsible for reporting to Nicky or other levels or people in upper management regarding vehicle break downs, correct?

A: We all do that again. . . .

Q: As the manager, you were responsible for making arrangements for assistance to alleviate any chauffeur or client problems, including vehicle break downs, correct?

A: You're saying as a manager, we all do that.

Q: I'm asking you, sir, when you were given the title manager, you were responsible for doing these things, correct? . . .

A: Well, the dispatcher is responsible for that, too, not only the manager, you know? Manager, dispatcher, that's the same thing.

Alvarez Dep., 41:6–42:14. Defendants in essence fail to demonstrate what Alvarez did on a day-to-day basis that would qualify as "management" duties—separate and apart from his daily dispatching duties. In addition, the minor duties Alvarez performed on top of his dispatching duties—locking up at night, taking care of the dogs, and sending out occasional memos relating to issues of modest importance like complimentary drinks—were incident to his duties as a dispatcher and cannot reasonably be characterized as "management."

Second, even assuming that Alvarez did perform some "management" functions, which, as explained above, the Court has grave doubts about, Defendants still must demonstrate that "management" was Alvarez's "primary duty." § 541.100. Defendants can demonstrate Alvarez's primary duty was management in one of two ways. First, they could show that Alvarez spent over 50 percent of his time performing

---

**10.** Although the evidence at this point is unclear whether Alvarez had the authority to handle complaints, discipline employees, or fire employees, the Court will assume, for the sake of argument, that Alvarez did have this authority.

management duties. *See* § 541.700(b). Or, second, they could show that, even though Alvarez spent less than 50 percent of his time performing management duties, he "nonetheless meet[s] the primary duty requirement" because "the other factors support such a conclusion." *See id.* § 541.700(b).

To begin, Defendants can point to no evidence to support the assertion that Alvarez spent more than 50 percent of his time performing management duties. No reasonable factfinder could conclude from the record that, including the time Alvarez spent dispatching cars, he spent over 50 percent of his time performing management functions like handling complaints, disciplining employees, or firing employees (or any of the minor duties he performed, like locking up the facility). So, the question becomes whether Alvarez "may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*

Under § 541.700(a), discussed above, the Court looks to several factors to help determine whether Alvarez's primary duty was management even though he spent less than 50 percent of his time engaging in management duties. First, the Court looks to the "relative importance" of the management duties Alvarez performed compared with his nonexempt duties. *Id.* § 541.700(a). Here, Alvarez's duties apart from his dispatching duties—i.e. locking doors, sending out occasional memoranda-pale in importance compared with his duties as a dispatcher.

The second factor under § 541.700(a) is the amount of time spent performing exempt work. Despite Defendants assertions to the contrary, they have not pointed to any evidence that indicates Alvarez spent more than a modest amount of time on non-dispatcher duties.

Third, the Court looks to Alvarez's "relative freedom from direct supervision." *Id.* It is undisputed that Alvarez had no direct supervision during the night shift. But the lack of supervision, which might otherwise weigh in favor of Defendants, is undermined by Key's decision not to fill the Night Dispatch Manager position before or after Alvarez, which suggests that a manager during the night shift was non-essential.

Fourth, the Court looks to Alvarez's salary compared with wages paid to other dispatchers. *Id.* Alvarez was paid $650 per week, or $16.25 per hour when calculated based on a 40–hour work week. Regular dispatchers were making between $10.00 and $14.50 per week (between $400 and $580 on a weekly basis). A dispatcher earning $14,50 per hour therefore was earning just $70 per week less than Alvarez, but, importantly, that dispatcher had the opportunity to earn overtime wages. Thus, a dispatcher earning $14.50 per hour had to work just 3.25 hours of overtime in a week ($14.50 * 40 hours = $580; $21.75 * 3.25 hours-$70.69; $580 + $70.69 = $650.69) to earn more than Alvarez in a particular week. Alvarez's salary was therefore only minimally higher, and sometimes lower, than a high-earning dispatcher. The consideration of these four factors strongly indicates that Alvarez's primary duty was not management.

Defendants cite many cases in which employees who spent more than 50 percent of their time performing nonexempt work were considered "managers" anyway, and they urge the Court to follow the conclusions reached in those cases. For example, in *Debrecht,* the plaintiffs were battalion chiefs of the Emergency Services Department. 243 F.Supp.2d at 1366. They were in charge of the 15 active fire

stations in the county; they ranked immediately below the Fire Chief, who headed the Department; they assumed command automatically when they arrived on a fire or emergency scene; and they made tactical decisions about how to confront emergency situations and whether additional personnel were required. *Id.* at 1370–71. Furthermore, they prepared annual performance evaluations on each of eight lieutenants; disciplined lieutenants; were involved in the hiring process; and they chaired several committees responsible for developing policies and procedures for the Department. *Id.* at 1371. Despite the battalion chiefs' contention that they engaged in these activities for just 15 percent of their working time—spending the majority of their time waiting to respond to calls, eating, and resting—the court in Debrecht found that their primary duty was "management" because the importance of their management responsibilities far outweighed what they did during down time. *Id.* at 1373.

Likewise, in *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir.1982), assistant managers of various Burger King franchises were considered "managers" despite spending more than 50 percent of their time preparing and serving food, which are nonexempt duties. The court held that the assistant managers were "managers" in part because they supervised other employees, scheduled employees, assigned work, oversaw production quality, spoke with customers, trained employees, determined the quality of food to be produced at any given time, and performed various recordkeeping, inventory, and cash reconciliation duties—all of this despite spending more than 50 percent of their time on nonexempt duties. *Id.* at 223.

These cases, coupled with the analysis of the applicable regulations, illustrate that Alvarez's duties here were almost entirely non-managerial. Whereas the plaintiffs in these cases had broad responsibilities relating to the overall structure and running of the business, almost all of Alvarez's responsibilities related to dispatching cars for various pickups. The only arguable managerial tasks he performed—having the authority to resolve complaints, discipline employees, and fire employees, sending out occasional memoranda, locking windows and doors—were responsibilities of minimal importance relative to his dispatching duties. Defendants have thus failed to carry their burden of showing that Alvarez's primary duty was management, and Alvarez cannot be considered an "executive" employee exempt from the FLSA's overtime wage requirements. Because Defendants have not carried their burden of showing Alvarez was an exempt "administrative" or "executive" employee under the FLSA, their Motion for Summary Judgment is denied.

## III. CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment is DENIED.